11-830-pr
Young v. Conway

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 23rd day of April, two thousand thirteen.

- - - - - - - - - - - - - - - - - - - - - - - -x

RUDOLPH YOUNG,

        <u>Petitioner-Appellee,</u>

    - v.-                           11-830-pr

JAMES CONWAY,

        <u>Respondent-Appellant.</u>

- - - - - - - - - - - - - - - - - - - - - - - -x

**FOR PETITIONER-APPELLEE:** John H. Blume, Cornell Death Penalty Project, Cornell Law School, Ithaca, New York; Brian Shiffrin, Easton Thompson Kasperek Shiffrin, LLP, Rochester, New York.

**FOR RESPONDENT-APPELLANT:** Geoffrey Kaeuper, Assistant District Attorney, <u>for</u> Sandra Doorley, District Attorney of Monroe County, Rochester, New York.

**FOR THE INNOCENCE PROJECT AS <u>AMICUS CURIAE</u>:** James L. Brochin, Jennifer H. Wu, Cassius K. Sims, Paul, Weiss, Rifkind, Wharton &

Garrison LLP, New York, New York; Barry C. Scheck, David Loftis, Karen Newirth, Innocence Project, Inc., New York, New York.

**ORDER**

Following disposition of this appeal on October 16, 2012, Respondent-Appellant James Conway filed a petition for rehearing <u>in banc</u>.  An active judge of the Court requested a poll on whether to rehear the case <u>in banc</u>.  A poll having been conducted and there being no majority favoring <u>in banc</u> review, rehearing <u>in banc</u> is hereby **DENIED**.

Barrington D. Parker, <u>Circuit Judge</u>, joined by Peter W. Hall, <u>Circuit Judge</u>, concurs by opinion in the denial of rehearing <u>in banc</u>.

Reena Raggi, <u>Circuit Judge</u>, joined by José A. Cabranes and Debra Ann Livingston, <u>Circuit Judges</u>, dissents by opinion from the denial of rehearing <u>in banc</u>.

José A. Cabranes, <u>Circuit Judge</u>, joined by Reena Raggi and Debra Ann Livingston, <u>Circuit Judges</u>, dissents by opinion from the denial of rehearing <u>in banc</u>.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, CLERK

2

BARRINGTON D. PARKER, Circuit Judge, joined by PETER W. HALL, Circuit Judge, concurring in the denial of rehearing *en banc*.

I concur fully in the panel's decision and write separately to emphasize why the panel's decision was correct and the case does not present a matter of exceptional importance warranting *en banc* review.

Judge Raggi[1] accuses the panel of committing misdeeds in several forms through its decision. First, we affirmed a grant of habeas relief in circumstances she finds objectionable. Next, we accused the New York Court of Appeals of unreasonably applying the independent source rule established by *United States v. Wade*, 388 U.S. 218 (1967). We are also said to have failed to apply *Stone v. Powell*, 428 U.S. 465 (1976), and finally, we are alleged to have referenced social science materials outside the state court record, in contravention of *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011).

Under Federal Rule of Appellate Procedure 35(a)(2), *en banc* consideration is appropriate only for matters of exceptional importance. This case entirely fails to meet that very demanding requirement. On the contrary, this case is as *sui generis* as we are likely to see. It breaks no new AEDPA ground. It delivers to Young, who will remain incarcerated on other charges, a victory in name alone: a retrial after approximately 19 years of incarceration. It affects no pending cases; nor does it affect the disposition of any case any of us is likely to see in the future. It leaves the law of identification testimony unaltered. In other words, it raises no issues having any systemic consequences for the development of the law and the administration of justice in this Circuit, which is what *en banc* review should be about. Recently, in *Watson v. Geren*, 587

---

[1] Judge Raggi is joined by Judge Cabranes and Judge Livingston.

1

F.3d 156, 158 (2d Cir. 2009) (per curiam), we denied rehearing *en banc* because the case involved a "narrow holding" on an issue that "arises so infrequently" that *en banc* review was not "justifiable." We noted that "*[e]n banc* review should be limited generally to only those cases that raise issues of important systemic consequences for the development of the law and the administration of justice." *Id.* at 160. This case is an especially poor candidate for *en banc* review because, as we point out below, the arguments Judge Raggi makes on the *Wade* issue, the major substantive issue in this case, are her own personal positions. The Appellant abandoned the *Wade* issue and never contested it on appeal.

While this case is decidedly unexceptional for Rule 35 purposes, it does expose differences among us over the proper role of federal habeas review post-AEDPA. At one end of the spectrum, there are respected jurists who believe that habeas is essentially an artifact that should be limited almost to the point of nonexistence and might not even be available in cases of actual innocence. *See In re Troy Anthony Davis*, 130 S. Ct. 1, 2-4 (2009) (dissent). There are others, such as I, who believe that habeas review is an essential component of federalism; that it is not discretionary; and that it is in fact required of us by the Constitution and by the oath we take to defend it.

I turn first to the criticism of our citations to social science research regarding eyewitness identifications. I take up the issue first because our citation to social science literature, while somewhat unusual, was, in the panel's view, an important service to the bench and bar.

As we pointed out in the panel opinion, eyewitness identification testimony is typically reliable and is, and should be, routinely accepted by juries. As we resolved this case, we all knew, however, that problems existed surrounding eyewitness testimony, and indeed the record

2

illustrated them in bold relief.  We also knew that mistaken eyewitness identifications were the leading source of wrongful convictions and that this problem was garnering growing attention around the country.  Just a few months ago, in *State v. Guilbert*, 306 Conn. 218, 234-37 (2012), for example, the Connecticut Supreme Court held that experts may testify about the reliability of eyewitness identifications due to the "near perfect scientific consensus" and "broad based judicial recognition" that "eyewitness identifications are potentially unreliable in a variety of ways unknown to the average juror," as evidenced by scientific research on the topic.[2]

Furthermore, the record–principally an outstanding amicus brief written by Paul Weiss and the Innocence Project[3]–directed us toward a robust and growing body of high-quality scientific studies addressing problems surrounding eyewitness identifications.  The scientific studies indicated that certain circumstances surrounding a crime–such as the perpetrator's wearing of a disguise, the presence of a weapon, the stress of the situation, the cross-racial nature of the crime, the passage of time between observation and identification, and the witness's exposure to the defendant through multiple identification procedures–may impair the ability of a witness to accurately process what she observed.  Many of these factors are counterintuitive and therefore cannot be deduced by the application of the "common sense" that juries are customarily instructed to employ.

---

[2] *Accord State v. Lawson*, 352 Or. 724, 727 (2012) (instituting new standard for admissibility of eyewitness identification evidence "[i]n light of the scientific research" regarding the fallibility of such identifications); *State v. Henderson*, 208 N.J. 208, 218-19, 234 (2011) (revising test for admissibility of eyewitness identification evidence, and also ordering that "enhanced" jury charges be developed to assist jurors in evaluating such evidence, after a review by a Special Master of hundreds of scientific studies revealed a "troubling lack of reliability in eyewitness identifications" and that the "possibility of mistaken identification is real").

[3] The Innocence Project is an organization dedicated primarily to providing pro bono legal and related investigative services to indigent prisoners whose actual innocence may be established through post-conviction evidence.  It pioneered the post-conviction DNA model that has led to the exoneration of 289 innocent persons to date, the vast majority of whom were originally convicted based, at least in part, on the testimony of eyewitnesses who turned out to be mistaken.

We concluded that it was a good idea to make trial judges aware of the existence of this information, in effect, as additional tools to help them with their work. I wrestled with how best to do this, as much of this information is contained in technical journals that are not especially easy to access. If you are not in the specialized field, you would be unlikely to know the journals even exist. We ultimately concluded that referencing the studies in an opinion was the best approach. That way, they could quickly and easily be accessed by law clerks and CJA attorneys, for example.

The opinion thus aims to point the bench and bar to the existence of the studies and to go no further. The opinion is explicit that our conclusion that the in-court identification in question lacked an independent source was not "compelled or controlled" by the literature we cited. *Young v. Conway*, 698 F.3d 69, 79 n.8 (2d Cir. 2012). The studies reinforced the conclusion we reached. Moreover, nothing in the opinion mandates district court judges to consider, let alone adopt or rely on any of the social science research we cited. They are free to draw on or reject any of the information "to the extent they deem it helpful." *Id.* at 80.

For more than 25 years, our court has acknowledged social science's findings regarding the problems associated with eyewitness identification testimony. In *United States v. Luis*, for example, we endorsed a "flexible approach" to trial judges' use of "a specific eyewitness charge in order to ameliorate the concerns expressed in . . . [*United States v. Wade*] relating to the dangers inherent in eyewitness testimony that may lead to misidentification." 835 F.2d 37, 41 (2d Cir. 1987). In *United States v. Serna*, 799 F.2d 842, 850 (2d Cir. 1986), we noted our "full[] aware[ness] of the dangers of testimony based purely on eyewitness identification," dangers on which we have "often commented." In *United States v. Veal*, we affirmed the district court's

4

exclusion of expert testimony on eyewitness identification in favor of "a very detailed instruction to the jury regarding the evaluation of eyewitness identification evidence," observing that district courts "may properly address the dangers of unreliable eyewitness identification testimony by giving a jury charge appropriate to the circumstances of the case." 182 F.3d 902, No. 98-1539, 1999 WL 446783, at *1 (2d Cir. June 16, 1999) (citing *Luis*, 835 F.2d at 41). The jury charge referred generically to findings by social scientists. *Id.* Thirty years ago, in *Kampshoff v. Smith*, 698 F.2d 581, 585 & n.4, 586 (2d Cir. 1983), we referred to psychology studies to inform our evaluation of eyewitness identifications. Thus, although Judge Raggi articulates a strong preference not to refer to social science information in an opinion, our discussion of these studies was consistent with the law of this Circuit.

As we merely highlighted the existence of these studies, our reference to the studies did not violate *Pinholster*, 131 S. Ct. 1388, which precludes a federal habeas court's "review" of material not in the state court record. Judge Raggi contends that "however much the panel may disclaim its social science discussion as *dictum* . . . the fact remains that it 'review[ed]' materials not before the state courts . . . . This is impermissible . . . ." Judge Raggi's position is, therefore, that *Pinholster*'s definition of "review" is so broad that it prohibits judges from so much as looking at materials if they contain anything outside of the state court record, regardless of whether the materials control a court's conclusions. Not only does this interpretation run contrary to the case law of this Circuit, such a position would require judges to know if the information contained in the briefs is within the state court record, before they could read them. We doubt very much the Supreme Court intended this result.

5

A more grounded and well-accepted understanding of *Pinholster* is that it prohibits us from relying on evidence beyond the state court record to reach our result. *See Pinholster*, 131 S. Ct. at 1398-99 (holding that the Ninth Circuit could not rely on evidence of defendant's mental illness that was only adduced at federal district court's evidentiary hearing and not presented during state court proceedings); s*ee also Lewis v. Thaler*, 701 F.3d 783, 791 (5th Cir. 2012) (holding that affidavit of doctor regarding defendant's IQ score that was admitted only to the federal district court could not be relied on by Fifth Circuit to grant § 2254 relief); *Ridgeway v. Zon*, No. 09-4789, 2011 WL 2357311, at *1-2 (2d Cir. June 15, 2011) (noting that evidence of trial counsel's ineffectiveness that was presented only at federal district court could not be relied on by Second Circuit in granting § 2254 relief). We agree entirely with, and were faithful to, these interpretations of *Pinholster*. Social science research of the type we discuss merely reinforced our conclusion, which would have been the same even absent these citations, instructive as they were. While Judge Raggi claims our disavowal of reliance on the social science literature is "unconvincing," she then goes on to acknowledge that the research could not have *compelled* our decision as she states that the "cited extrinsic materials do not speak to the independent-source question"–which, after all, is the central issue in this case. As we did not rely, and by Judge Raggi's declaration, could not have relied on the social science research to reach our result, but merely referred to it to assist the bench and bar, we did not violate *Pinholster*.

The next issue Judge Raggi raises in support of *en banc* review is our decision on the merits upholding the district court's conclusion that the New York courts unreasonably applied *Wade*. *See* 28 U.S.C. § 2254(d). The most important thing to realize when evaluating Judge

Raggi's arguments is that they are not those of counsel for respondent, the Monroe County District Attorney's office. The District Attorney's brief did not contest the district court's finding that there was no independent source for the identification. This omission by the party directly affected speaks volumes. The fair inference is that the District Attorney concluded that the district court was correct on the merits; otherwise the issue would have been front and center in his brief to us. Consequently, where we are left on the dispositive issue in the case is that Judge Raggi not only disagrees with the panel, she also disagrees with both parties to the appeal. She then proceeds to make arguments on behalf of the District Attorney that, for whatever reason, he elected not to make for himself.

Judge Raggi's dissent advances two basic arguments. The first is not especially important. The New York Court of Appeals concluded that it could not disturb the holding of the Appellate Division that an independent source existed because it was an issue of fact beyond its review. *See People v. Young*, 7 N.Y.3d 40, 44 (2006) (describing the Appellate Division's finding with respect to the independent source issue as "an issue of fact" and holding that therefore the court "may not disturb" the Appellate Division's finding). It is pretty clear that the NYCA misspoke because *Wade* independent source inquiries are a mixed question of law and fact. *See Wade*, 388 U.S. at 241-42; *see also Tomlin v. Myers*, 30 F.3d 1235, 1241 n.12 (9th Cir. 1994) ("[w]hether [the] identification was derived from an independent source is a mixed question of law and fact"). Judge Raggi, however, disputes whether the NYCA really intended to say that independent source findings are issues of fact that they could not review, relying on the fact that in a completely separate case, *People v. Jackson*, 98 N.Y.2d 555, 559 (2002), the NYCA correctly stated that such issues are a mixed question of law and fact. While Judge Raggi

7

chooses not to take the NYCA at its word in this case, we did. But no matter whether Judge Raggi is correct or we are—and I maintain that we are—our decision did not turn on this error. Thus, the disagreement between Judge Raggi and the panel on this point is not a matter of exceptional importance warranting *en banc* review.

What our opinion does turn on, which Judge Raggi takes up in her second argument, is our finding that a closely-divided (3-2) panel of the New York Appellate Division unreasonably applied *Wade* in deciding that Mrs. Sykes's identification of Mr. Young was independent of any earlier tainted identification procedure. According to Judge Raggi, the panel's conclusion that the state courts unreasonably applied *Wade* is incorrect, violates notions of comity, and runs contrary to the deference to state courts required by decisions such as *Harrington v. Richter*, 131 S. Ct. 770 (2011). It bears repeating that this is *not* the position of the Appellant, which elected not to contest the district court's conclusion on this issue.

The panel's opinion goes through the *Wade* factors[4] in detail and explains why we concluded, as had the district court, that no independent source existed for Mrs. Sykes's identification, eight years after the fact, of an individual she could not really see in the first place. The support in the record for this conclusion was overwhelming: Recall that during the commission of the crime, the perpetrator's entire body was covered by a blanket and his face was completely covered by a scarf, with only the exception of his eyes, about which Mrs. Sykes said

---

[4]According to *Wade*, to determine whether a particular identification can be considered independent of any earlier taint, the following factors are to be considered: (1) the prior opportunity to observe the alleged criminal act; (2) the existence of any discrepancy between any post-crime description and the defendant's actual description; (3) any identification of another person; (4) the identification by picture of the defendant prior to the identification; (5) the failure to identify the defendant on a prior occasion; and (6) the lapse of time between the alleged act and the lineup identification. 388 U.S. at 240-41.

8

there was nothing distinguishing or remarkable. Mrs. Sykes observed the perpetrator's eyes during a period of five to seven minutes, in a highly stressful situation.

Mrs. Sykes's opportunity to view the perpetrator was so limited that after the crime she could not assist police in preparing a sketch of the perpetrator. When initially shown a photograph array, which included Mr. Young, neither Mrs. nor Mr. Sykes selected him. It was only in the unconstitutional police lineup, in which Mr. Young was the only person whose photo was also included in the earlier array, that Mrs. Sykes–but not Mr. Sykes–selected Mr. Young. Not only did Mrs. Sykes view Mr. Young in the lineup, she also observed Mr. Young as the defendant throughout the first trial.

On this record, the district court found that Mrs. Sykes's identification of Petitioner Young, eight years later, had no independent source, but rather it "stemmed from the suggestive courtroom setting in which Petitioner was obviously the accused [or] [a]t best . . . relied on the suppressed, illegal pre-trial identification where Mrs. Sykes saw Petitioner *and* heard his voice." *Young v. Conway*, 761 F. Supp. 2d 59, 76 (W.D.N.Y. 2011). The district court concluded that in "[r]eviewing the *Wade* factors, all of them are on Petitioner's side of the scale, and none of them are on the government's." *Id.* at 75. Further, the district court found, and we agree, that without the identification, the prosecution had no case. The corroborating evidence Judge Raggi references–Mr. Young's criminal record, testimony from a questionable witness regarding the stolen items being seen in a house in which Mr. Young once stayed, which according to the testimony, was visited by up to thirty people each night who would "be in and out"–was clearly insufficient for conviction beyond a reasonable doubt for robbery. App. at 272-73.

9

In the face of such facts and findings, Judge Raggi suggests that the New York courts did not unreasonably err, but may have merely "assigned more weight" to some *Wade* factors "than the panel would have." But this conclusion is belied by the record. After all, if, as here, every single *Wade* factor turned against a finding of an independent source, then it makes no difference how they are weighted.

Bearing the standard for the Appellant, Judge Raggi, relying on *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011), which precludes federal habeas relief so long as "fairminded jurists could disagree on the correctness of the state court's decision," argues that because several state court judges ruled that there was an independent source for the identification, there can be said to be 'disagreement by fairminded jurists' and habeas relief is therefore precluded. If this is correct, then habeas relief would never be available since the writ, by its nature, requires federal courts to, in the appropriate case, disagree with state judges on matters of federal law. Judge Raggi asserts that it is "no small matter for a panel of this court to charge [that] New York's . . . court[s]" did not properly apply a particular precedent. We agree, and we did not do so lightly.

As a final matter allegedly meriting *en banc* review, Judge Raggi argues that our decision violates *Stone v. Powell*, which established that a state prisoner may not be granted federal habeas relief on a Fourth Amendment claim if he has had a full and fair opportunity to litigate that claim in state court. 428 U.S. 465, 494 (1976). In its opinion, however, the Supreme Court made clear that *Stone*'s rule is not jurisdictional. *See Stone*, 428 U.S. 465, 494 n.37 (1976) ("[W]e hold only that a federal court *need not* apply the exclusionary rule on habeas review of a Fourth Amendment claim absent a showing that the state prisoner was denied [full and fair review in state court]. Our decision does not mean that the federal court lacks jurisdiction over

10

such a claim . . . ." (emphasis added)). It is well-settled that non-jurisdictional arguments and defenses may be waived. *See, e.g.*, *Gonzales v. Thaler*, 132 S. Ct. 641, 648, 651 (2012) (holding, in the federal habeas context, that because a rule was non-jurisdictional and the state had failed to object based on the rule before the district court, the court of appeals was not barred from adjudicating the claim fully on its merits); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 504 (2006) (holding that employer's numerosity of employees requirement under Title VII was non-jurisdictional and therefore waived if objection not timely raised). In this case, the Appellant failed to raise the *Stone* issue in the district court and asserted it for the first time on appeal. We held that because *Stone* was not raised below, it was waived.[5] We routinely apply waiver rules to habeas petitioners, and we saw no reason to make an exception for the state here. *See, e.g.*, *Arroyo v. Senkowski*, 36 F. App'x 660, 663 (2d Cir. 2002) (holding that state court had not complied with the fourth requirement of *Waller* test for courtroom closure, but because habeas petitioner had failed to raise that objection to the district court he "forfeited [the] issue on appeal"). Should a panel encounter the issue in the future, that panel could choose to apply *Stone sua sponte*, as nothing in our opinion forecloses that option.

Judge Raggi takes the position that *Stone* can never be waived and that we were therefore obligated *sua sponte* to impose *Stone*'s bar despite the District Attorney's failure to raise it. She contends that while *Stone* is not jurisdictional, "it is categorical" and therefore every petitioner

---

[5]We have not hesitated in the past to require the state, in the context of a § 2254 habeas proceeding, to bring to the district court's attention a decision of this Court which would have eviscerated the petitioner's position on appeal. *See Stevens v. Miller*, 676 F.3d 62, 65 (2d Cir. 2012). The failure to do so, we held in *Stevens*, foreclosed the state's attempts to benefit from the decision on appeal, despite the fact that the decision would have "ensured the State of certain victory." *Id. See also Cornell v. Kirkpatrick*, 665 F.3d 369, 376-77 (2d Cir. 2011) (holding that state's consistent statement to the district court that petitioner had exhausted his particular claim, meant that on appeal, state could not then argue that petitioner had failed to exhaust that claim).

11

must show the denial of a full and fair opportunity to litigate his claim in state court as a "prerequisite" to federal review. If demonstrating that the denial of a fair opportunity is a requirement for federal review on the merits, however, then by definition, *Stone* would be jurisdictional. But the Supreme Court has clearly stated that *Stone* is not jurisdictional; and it has *never* held that a petitioner must show a denial of a full and fair opportunity in state court as a prerequisite to federal review of his Fourth Amendment claims.

Although the law is divergent throughout the circuits, a fair reading is that the weight of authority is that courts may, but are not required, to raise *Stone sua sponte*. *See Tart v. Massachusetts*, 949 F.2d 490, 497 n.6 (1st Cir. 1991) (deciding the case on other grounds but, noting "the *discretionary* authority of federal appellate courts to raise the *Stone* prohibition *sua sponte*" (emphasis added)); *Davis v. Blackburn*, 803 F.2d 1371, 1372-73 (5th Cir. 1986) (acknowledging that the court is not "foreclosed from *sua sponte* applying the principle of *Stone v. Powell*" but declining to require its mandatory imposition); *Wallace v. Duckworth*, 778 F.2d 1215, 1219 n.1 (7th Cir. 1985) ("Moreover, respondents never raised any *Stone v. Powell* argument, and since the rule of *Stone v. Powell* is not a jurisdictional rule, we need not raise the issue *sua sponte*." (internal citations omitted)).[6]

Judge Raggi dismisses the authority from the other circuits as dicta, and relies heavily on the Ninth Circuit's divided panel opinion in *Woolery v. Arave*, 8 F.3d 1325, 1326 (9th Cir. 1993), for support. At the end of the day, what Judge Raggi describes as a "circuit split" comes

---

[6] The cases Judge Raggi cites from this Circuit are unhelpful as they involved situations where the *Stone* issue was raised below so there was no question regarding waiver (*Graham v. Costello*, 299 F.3d 129, 133-34 (2d Cir. 2002)) or *Stone* had just been decided, so there was no opportunity to raise it in the district court (*Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir. 1977)).

12

down to this: Everyone agrees that *Stone* is not jurisdictional; the First, Fifth and Seventh Circuits think that *Stone* can be, but need not be raised *sua sponte*; the Ninth Circuit believes *Stone* is not waivable. We concluded the defense was waivable and we chose not to raise it *sua sponte* as we did not think it was our role to do the DA's job for it. Had a different panel obtained the assignment, they may have chosen to apply *Stone sua sponte*; and again nothing in our opinion would prevent them from doing so in the future.

Finally, I do not believe it is possible to advance persuasive arguments in support of the proposition that this issue meets the test for exceptionalism under Rule 35. This case is entirely a one off. The chances of any of us ever seeing a Fourth Amendment habeas case in which the government fails to cite *Stone v. Powell* are far too low to estimate. I cannot figure out why the District Attorney's office, in its nearly forty-page district court memorandum of law, raised procedural default, exhaustion and various other alleged bars to federal review but failed to mention *Stone*. Was this deliberate, and, if so, why? Extended speculation is not required because I very seriously doubt that we are likely again to see such an omission. In other words, an issue that has not arisen in the past, that does not affect any case pending in the queue, and that is highly unlikely to recur in the future is not of "exceptional importance" for Rule 35 purposes.

For these reasons, I concur in the denial of rehearing *en banc*.

REENA RAGGI, Circuit Judge, joined by JOSÉ A. CABRANES and DEBRA ANN LIVINGSTON, Circuit Judges, dissenting from the denial of rehearing en banc:

A panel of the court grants habeas relief to a recidivist armed robber based on its determination that the New York Court of Appeals does not understand, and therefore unreasonably applied, a precept of criminal law known to every law student: the independent-source rule pronounced in United States v. Wade, 388 U.S. 218, 240–41 (1967), which requires that an in-court identification following a tainted lineup have an independent basis. The panel charges New York's highest court with operating under the "mistaken impression" that an independent-source inquiry is an issue of fact, rather than a mixed question of fact and law. Young v. Conway, 698 F.3d 69, 84–85 (2d Cir. 2012). That conclusion is belied by the New York Court of Appeals' own precedent. See, e.g., People v. Jackson, 98 N.Y.2d 555, 559, 750 N.Y.S.2d 561, 564 (2002) (stating that "Wade hearing . . . involves mixed questions of law and fact.").

More troubling still, in granting habeas relief based on its own Wade analysis of petitioner's Fourth Amendment challenge, the panel puts this court at odds with controlling Supreme Court precedents in three respects. First, the panel grants habeas relief to a state prisoner who does not allege, and who cannot demonstrate, that he was denied a full and fair opportunity to litigate his Fourth Amendment claim in state court as required by Stone v. Powell, 428 U.S. 465 (1976). Moreover, by invoking forfeiture to justify this departure from Stone, the panel creates a "circuit split." See Woolery v. Arave, 8 F.3d 1325, 1326 (9th Cir. 1993) (holding that Stone v. Powell precludes federal court enforcement of exclusionary rule

1

through writ of habeas corpus "even though the state has failed to raise the Stone issue").

Second, the panel's independent-source analysis fails to accord New York courts the AEDPA deference demanded by Harrington v. Richter, 131 S. Ct. 770 (2011). Third, the panel supports its independent-source determination by reference to social science materials outside the state court record in contravention of Cullen v. Pinholster, 131 S. Ct. 1388 (2011).

These are errors of exceptional importance that misdirect our habeas jurisprudence, and we should correct them en banc before they are corrected for us. See Fed. R. App. P. 35(a)(2).[1] Insofar as the court declines to accord the case further review, I respectfully dissent.

---

[1] In urging otherwise, Judge Parker submits that nothing more is at stake here than our personal disagreement about the "proper role of federal habeas review post-AEDPA." Ante at **[2]**. In fact, Judge Parker's disagreement is not with those of us seeking en banc review, but with the Supreme Court, which has defined the "proper role of habeas review" in Stone v. Powell, Harrington v. Richter, and Cullen v. Pinholster. Appellate courts' failure to adhere to 28 U.S.C. § 2254 as construed by the Supreme Court has triggered reversal or vacatur in at least nineteen recent cases. See Marshall v. Rodgers, 133 S. Ct. 1446 (2013); Johnson v. Williams, 133 S. Ct. 1088 (2013); Ryan v. Gonzales, 133 S. Ct. 696 (2013); Parker v. Matthews, 132 S. Ct. 2148 (2012); Coleman v. Johnson, 132 S. Ct. 2060 (2012); Wetzel v. Lambert, 132 S. Ct. 1195 (2012); Hardy v. Cross, 132 S. Ct. 490 (2011); Bobby v. Dixon, 132 S. Ct. 26 (2011); Cavazos v. Smith, 132 S. Ct. 2 (2011); Bobby v. Mitts, 131 S. Ct. 1762 (2011); Cullen v. Pinholster, 131 S. Ct. 1388 (2011); Felkner v. Jackson, 131 S. Ct. 1305 (2011); Premo v. Moore, 131 S. Ct. 733 (2011); Harrington v. Richter, 131 S. Ct. 770 (2011); Renico v. Lett, 559 U.S. 766 (2010); Berghuis v. Smith, 559 U.S. 314 (2010); Thaler v. Haynes, 559 U.S. 43 (2010); Smith v. Spisak, 558 U.S. 139 (2010); McDaniel v. Brown, 558 U.S. 120 (2010).

I.   Background

      A.   The Charged Robbery

On the night of March 29, 1991, a man armed with a sledgehammer and an axe forcibly entered the home of Lisa and William Sykes and, wielding the axe over the head of the wheelchair-bound Mr. Sykes, threatened to kill him if Mrs. Sykes did not surrender the couple's money and valuables. Not surprisingly, Mrs. Sykes complied. Among items taken that would later link petitioner Rudolph Young to the robbery were binoculars bearing the name "Sykes," three watches, and a pair of gloves.

      B.   Fourth Amendment Challenge to Mrs. Sykes's Identification

At issue on habeas review was Mrs. Sykes's in-court identification of Young as the robber. The problem was not that her identification was infected by suggestive police procedures, so as to raise Fourteenth Amendment due process concerns. Rather, it was that she first identified Young at a lineup found to be the fruit of an unlawful arrest. See People v. Young, 255 A.D.2d 905, 683 N.Y.S.2d 677 (4th Dep't 1998) (holding that Young's participation in lineup resulted from arrest lacking probable cause).[2]

---

[2] Although the panel hints that the lineup was suggestive because Mrs. Sykes had previously viewed a photo array including Young's picture, see Young v. Conway, 698 F.3d at 83–84, Young affirmatively waived that argument in both the state and district courts. See Hr'g Tr. 3–4, People v. Young, Ind. No. 91-0402 (N.Y. Sup. Ct. May 4, 1999) ("This is not an issue of a suggestive identification procedure which is under the . . . right to due process."); Young v. Conway, 761 F. Supp. 2d 59, 73 (W.D.N.Y. 2011) ("[Young] emphasizes that he is 'arguing that his lineup was illegal, not suggestive, therefore he is under the [Wade] standards and not the standard set forth in Neil v. Biggers, 409 U.S. 188 [1972].'"). Moreover, courts have consistently held that a witness's viewing of a suspect in successive pre-trial identification procedures is not inherently suggestive. See, e.g., Dunlap

The admission of this tainted line-up identification at Young's first trial prompted reversal of his conviction on direct appeal. See id. at 906, 683 N.Y.S.2d at 678. To ensure that this Fourth Amendment error would not also taint any in-court identification on retrial, the trial court had to determine whether Mrs. Sykes retained a basis for making such an identification independent of the lineup. See United States v. Wade, 388 U.S. at 240–41.[3]

After a Wade hearing, the trial court determined that Mrs. Sykes had the requisite independent basis for making a trial identification. Although the robber had worn a blanket over his body and a scarf over the lower part of his face, the court credited Mrs. Sykes that she "really stared" at him for five to seven minutes at close range in well-lit conditions, to see if he was someone she recognized. Hr'g Tr. 34, People v. Young, Ind. No. 91-0402

v. Burge, 583 F.3d 160, 165 (2d Cir. 2009); United States v. Concepcion, 983 F.2d 369, 379 (2d Cir. 1992); People v. Peterkin, 81 A.D.3d 1358, 1359, 921 N.Y.S.2d 744, 745 (4th Dep't 2011); People v. Munoz, 223 A.D.2d 370, 370, 636 N.Y.S.2d 313, 314 (1st Dep't 1996).

[3] Wade established this independent-source rule in the context of a lineup tainted by denial of the Sixth Amendment right to counsel. See 388 U.S. at 221, 240–41. Among the factors Wade identified as relevant to making an independent-source determination are (1) the witness's opportunity to observe the alleged criminal act, (2) the existence of any discrepancy between any pre-lineup description by the witness and the defendant's actual appearance, (3) any identification by the witness prior to the lineup of a person other than defendant, (4) the witness's identification by picture of the defendant prior to the lineup, (5) the witness's failure to identify the defendant on a prior occasion, and (6) the lapse of time between the alleged crime and the lineup identification. See id. at 241 (stating that factors are illustrative).

The Supreme Court subsequently applied Wade to an identification challenge grounded in a Fourth Amendment violation in United States v. Crews, 445 U.S. 463, 472–73, 477 (1980) (reinstating conviction based on in-court identification supported by independent recollection of crime untainted by intervening identifications that were fruits of unlawful arrest). Thus, references to the Wade rule in this opinion should be understood to incorporate Crews as well.

4

(N.Y. Sup. Ct. Mar. 11, 1999). He was not. Nevertheless, as a consequence of her attention, Mrs. Sykes formed a strong mental image of the robber's eyes. See id. at 35 (stating that, for nights after robbery, she would awaken "seeing those eyes in nightmares"). Mrs. Sykes's deliberate focus on the robber's face was evident even to him, because he told her at one point, "Don't look at my face." Id. at 32.

In initially describing the robber, Mrs. Sykes told police that he was a black male in his twenties, approximately five-feet-ten-inches tall, with a medium build. See id. at 34. Although Young is black, he was 34 years old at the time of the Sykes robbery, and is six-feet to six-feet-one-inch tall. See Trial Tr. 302–03, People v. Young, Ind. No. 91-0402 (N.Y. Sup. Ct. Jan. 10, 12–14, 2000). The state trial court, with the advantage of seeing and hearing Mrs. Sykes, did not think these discrepancies indicated that her in-court identification would be influenced by the lineup. Nor was it so persuaded by Mrs. Sykes's inability to help create a composite sketch of the robber soon after the crime, crediting her explanation that she had mistakenly understood that she would have had to have seen the robber's full face to help with a sketch. See Mar. 11, 1999 Hr'g Tr. 34. The court similarly credited Mrs. Sykes that she was unable to identify Young from a photo array two days before the lineup because a "photograph is not a real person" and "did not look real" to her. Id. at 64. She stated that she was able to identify Young from among six men in the lineup based on his eyes and voice. Indeed, she asserted that she could have made the lineup identification based on Young's eyes alone. See id. at 77–78. She maintained that, even eight years after the crime, she had a recollection of the robber's eyes that was independent of seeing Young in the lineup, testimony credited by the trial court. See id.

5

## C.     Retrial and Sentencing

At Young's retrial, the defense vigorously cross-examined Mrs. Sykes about the reliability of her identification. See Trial Tr. 59–88. It was not, however, permitted to offer expert testimony on the reliability of eyewitness identifications. Meanwhile, the prosecution linked Young to the Sykes robbery through two witnesses, one of whom testified that, in the month following the robbery, Young had given her binoculars bearing the name "Sykes" and three watches to sell,[4] and the other of whom identified a pair of gloves belonging to the Sykeses as ones that she had found left in her home at a time when Young was a frequent guest. See id. at 136, 261.

After the jury found Young guilty, the sentencing judge heard evidence of Young's extensive criminal history—including convictions for murder in North Carolina, robbery in Georgia, and robbery and burglary in New York—as well as his admission to committing 140 to 150 burglaries between 1988 and 1991. See Sent. Hr'g Tr. 76, 114–15, 128, People v. Young, Ind. No. 91-0402 (N.Y. Sup. Ct. July 14, 2000); App'x of State Court Records 181, Young v. Conway, 761 F. Supp. 2d 59 (W.D.N.Y. 2011) (No. 07-CV-6047 DGL). The court sentenced Young as a persistent felony offender, see N.Y. Penal Law § 70.10; N.Y. Crim. Proc. Law § 400.20, to a prison term of 15 years to life. See Sent. Tr. 8–10, 45, People v. Young, Ind. No. 91-0402 (N.Y. Sup. Ct. Sept. 7, 2000).

---

[4] The witness explained how, at police direction, she recovered the binoculars from the person to whom she had sold them, and the binoculars were put into evidence at trial. See Trial Tr. 136.

6

D.    Appellate Review

On direct appeal, Young argued, among other things, that Wade precluded Mrs. Sykes's in-court identification. The Appellate Division rejected the argument, holding by a vote of three to two that the prosecution had carried its burden to establish that the trial identification rested on a basis independent of the Fourth Amendment-tainted lineup. See People v. Young, 20 A.D.3d 893, 798 N.Y.S.2d 625 (4th Dep't 2005).

The New York Court of Appeals granted review and affirmed by a vote of six to one. See People v. Young, 7 N.Y.3d 40, 817 N.Y.S.2d 576 (2006). In a decision largely devoted to explaining why the failure to admit defense expert testimony did not warrant reversal, see id. at 44–46, 817 N.Y.S.2d at 578–80, the court recognized Young's Wade argument to be that, "as a matter of law . . . it was impossible to find by the requisite clear and convincing evidence that the lineup would not influence [Mrs. Sykes's] in-court identification," id. at 44, 817 N.Y.S.2d at 578. The Court concluded that the argument failed "on an issue of fact," i.e., the lower courts' finding that Mrs. Sykes possessed a recollection of the robbery independent from the tainted lineup. Id. It explained, "[t]here is support in the record for their finding, and we may not disturb it." Id.

E.    Section 2254 Petition

On consent of the parties, Young's habeas petition was decided by a magistrate judge, who ruled in Young's favor and vacated his convictions for the Sykes robbery.  See Young v. Conway, 761 F. Supp. 2d at 77.  A panel of this court affirmed but remanded to allow the state to retry Young without Mrs. Sykes's identification.  See Young v. Conway, 698 F.3d at 89.

II.   Discussion

A.    *Stone v. Powell* Precludes Habeas Review of Young's Fourth Amendment Challenge

For almost 40 years, it has been well established that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner <u>may not</u> be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Stone v. Powell, 428 U.S. at 494 (emphasis added; footnote omitted).  In this case, Young did not plead—much less prove—that he was denied a full and fair opportunity to litigate his Fourth Amendment-based <u>Wade</u> claim in New York's courts.  To the contrary, the record shows that he was afforded such an opportunity at all three levels of state court review.  In these circumstances, I respectfully submit that his Fourth Amendment <u>Wade</u> challenge is not a proper subject for habeas review.

In concluding otherwise, the panel observes that (1) <u>Stone</u>'s bar is not jurisdictional, and (2) the state forfeited its claim to the bar by raising it on appeal without having done so

8

in the district court. See Young v. Conway, 698 F.3d at 85–87. While the jurisdictional point is beyond dispute, see Stone v. Powell, 428 U.S. at 494 n.37; accord Withrow v. Williams, 507 U.S. 680, 686 (1993), the same cannot be said about the panel's reliance on forfeiture.

In support, the panel quotes the following language from Stone:

> In sum, we hold only that a federal court need not apply the exclusionary rule on habeas review of a Fourth Amendment claim absent a showing that the state prisoner was denied an opportunity for a full and fair litigation of that claim at trial and on direct review. Our decision does not mean that the federal court lacks jurisdiction over such a claim . . . .

428 U.S. at 494 n.37, quoted in Young v. Conway, 698 F.3d at 85. In fact, the last sentence continues with language that defeats the panel's conclusion: "Our decision does not mean that the federal court lacks jurisdiction over such a claim, but only that the application of the [exclusionary] rule is limited to cases in which there has been both such a showing and a Fourth Amendment violation." Id. (emphasis added). In short, Stone's limitation may be prudential rather than jurisdictional, but it is categorical. Habeas review of Fourth Amendment claims is "limited" by a prerequisite: "a showing that the state prisoner was denied an opportunity for a full and fair litigation of that claim" in the state courts. Id. Unless and until that showing is made, a federal habeas court "may not" apply the exclusionary rule to upset a state conviction. Id. at 494.[5]

_____

[5] Any number of non-jurisdictional rules are categorical. AEDPA categorically precludes habeas grants except where state rulings are "contrary to" or "an unreasonable application of" clearly established federal law. 28 U.S.C. § 2254(d)(1); see also Eze v. Senkowski, 321 F.3d 110, 120–21 (2d Cir. 2003) (rejecting petitioner's argument that state

9

Our precedent has heretofore adhered to this limitation, recognizing that "Fourth Amendment claims are not reviewable by the federal courts when raised in a petition brought under § 2254 unless the state prisoner shows that he or she has not had a full and fair opportunity to litigate that claim in the state court." Graham v. Costello, 299 F.3d 129, 133–34 (2d Cir. 2002) (emphasis added). Indeed, Graham signals that courts may not excuse petitioners from this burden: "[T]he bar to federal habeas review of Fourth Amendment claims is permanent and incurable absent a showing that the state failed to provide a full and fair opportunity to litigate the claim." Id. at 134 (emphasis added); see also Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977) (en banc) ("Stone v. Powell . . . holds that we have no authority to review the state record and grant the writ simply because we disagree with the result reached by the state courts."). Sister circuits agree that it is a petitioner's

---

waived AEDPA deference by not referencing standard before district court, and observing that § 2254(d)(1) "contains unequivocally mandatory language"). Harrington v. Richter, 131 S. Ct. at 786, categorically requires a habeas petitioner to show that a challenged ruling is unreasonable as well as erroneous. Cullen v. Pinholster, 131 S. Ct. at 1398, categorically limits habeas review to the state court record. These rules not only allocate burdens between parties to the litigation; they also ensure proper deference to state courts within our federal system to resolve matters—even constitutional matters—pertaining to their own criminal law. See Calderon v. Thompson, 523 U.S. 538, 555–56 (1998) ("Federal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." (internal quotation marks omitted)); see also Harrington v. Richter, 131 S. Ct. at 786 (cautioning that federal habeas guards "against extreme malfunctions in the state criminal justice systems" and is "not a substitute for ordinary error correction through appeal" (internal quotation marks omitted)). Such deference plainly informs Stone's demand for a showing that petitioner was denied a full and fair opportunity to litigate a Fourth Amendment claim in state courts as a precondition to federal review. In the absence of such a showing, the state courts are no less entitled to deference simply because a respondent custodian was negligent in the timing of his invocation of Stone.

10

burden "to plead and prove" that his case fits within the narrow exception to the <u>Stone</u> bar. <u>Davis v. Blackburn</u>, 803 F.2d 1371, 1372 (5th Cir. 1986); <u>see</u> <u>Sanna v. DiPaolo</u>, 265 F.3d 1, 8 (1st Cir. 2001); <u>Doleman v. Muncy</u>, 579 F.2d 1258, 1266 (4th Cir. 1978).

The panel's reliance on respondent's failure to invoke <u>Stone</u> in the district court to absolve Young from this burden not only lacks support in <u>Stone</u> jurisprudence but also creates a "circuit split." In <u>Woolery v. Arave</u>, the Ninth Circuit acknowledged that <u>Stone</u>'s bar was prudential, but nonetheless concluded that it was "founded in policy considerations that oblige the court to raise the issue <u>sua sponte</u> if the state neglects to assert it." 8 F.3d at 1327. Thus, "absent a showing that the state denied a full and fair opportunity to litigate the Fourth Amendment claim, the rule of <u>Stone v. Powell</u> precludes the federal court from enforcing the exclusionary rule through the writ of habeas corpus even though the state has failed to raise the <u>Stone</u> issue." <u>Id.</u> at 1326.[6]

---

[6] The panel suggests that the Ninth Circuit is but one of four courts to have addressed—and the only one to have found—a <u>sua sponte</u> obligation by courts to apply the <u>Stone</u> bar. <u>See</u> <u>Young v. Conway</u>, 698 F.3d at 86 n.10. In fact, in <u>Davis v. Blackburn</u>, the Fifth Circuit recognized an obligation "to apply <u>Stone</u> as a prudential limitation on the exercise of [its] jurisdiction . . . , even if it must be raised <u>sua sponte</u>." 803 F.2d at 1372–73. The other two cases cited by the panel reference the issue only in <u>dicta</u> and hardly support ignoring the <u>Stone</u> bar in this case. <u>See</u> <u>Tart v. Massachusetts</u>, 949 F.2d 490, 497 n.6 (1st Cir. 1991) (describing it as "perilous" for petitioner to rely on state's failure to raise <u>Stone</u> bar in light of caselaw suggesting court may do so <u>sua sponte</u>, but concluding no need to do so because petitioner's Fourth Amendment claim was meritless in any event); <u>Wallace v. Duckworth</u>, 778 F.2d 1215, 1219 n.1 (7th Cir. 1985) (observing that <u>Stone</u>'s non-jurisdictional bar need not be raised <u>sua sponte</u>, but denying petition for failure to exhaust remedies); <u>but see</u> <u>id.</u> at 1226 (Posner, J., concurring) (identifying no need to consider exhaustion because petition "is in any event frivolous in light of <u>Stone v. Powell</u>").

Notably, Woolery reached this conclusion in the case of a petitioner who had at least pleaded the denial of an opportunity to litigate his Fourth Amendment claim in state court. In dissent, Judge Reinhardt thought that the state's failure to respond to this pleading permitted the district court to find that the state had "conceded" the Stone exception and to reach the merits. Id. at 1331 (Reinhardt, J., dissenting). The majority, however, concluded that petitioner's pleading meant simply that he had not "waived" his claim to a Stone exception; thus, on remand, he was entitled to demonstrate the pleaded denial. Id. at 1328 n.3. By contrast, Young has never alleged that he was denied an opportunity to litigate his Fourth Amendment claim in state court.[7] Nor would the record permit him to do so.

As further justification for not holding Young to his Stone burden, the panel suggests that identification challenges fall outside Stone's paradigm because identification evidence "lacks the typical indicia of reliability that ordinarily weigh against re-litigating a Fourth Amendment claim on collateral review." Young v. Conway, 698 F.3d at 87; but see id. at 80 (acknowledging that "much eyewitness identification testimony is reliable"); ante at **[2]** (reiterating that "eyewitness identification testimony is typically reliable"). The contention is not persuasive and contravenes the instructions of the Supreme Court. Stone does not admit exceptions based on the types of evidence subject to Fourth Amendment challenges. Having made the general determination that application of the exclusionary rule to collateral

---

[7] Young failed to assert that he was denied an opportunity to litigate his Fourth Amendment claim in the state courts not only in his initial pro se § 2254 petition, but also in his counseled brief to this court responding to the state's invocation of the Stone bar.

12

Fourth Amendment challenges would deprive factfinders of "typically reliable" evidence that was "often the most probative information bearing on . . . guilt or innocence," Stone v. Powell, 428 U.S. at 490 (emphasis added), while having only a "minimal" deterrent effect on Fourth Amendment violations, id. at 486, the Supreme Court erected a categorical bar: "a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial" except in those circumstances where the state has failed to provide "an opportunity for full and fair litigation" of the claim, id. at 494. Stone specifically rejected the contention that "isolated cases," in which the costs and benefits of applying the exclusionary rule might be different, could justify lifting this categorical bar. Id.

In sum, because Young has not pleaded, and the record would not permit him to prove, that he was denied an opportunity fully and fairly to litigate his Fourth Amendment Wade claim in the New York courts, this court should clarify en banc that the claim is barred from federal habeas review by Stone v. Powell.

B.    The Panel's Identification of *Wade* Error Misconstrues New York Precedent and Defies *Harrington v. Richter*

Even if Stone did not bar habeas review of Young's Fourth Amendment challenge, the panel's award in his favor fails to comport with 28 U.S.C. § 2254(d)(1). That section states that federal habeas relief "shall not be granted" to a state prisoner with respect to any claim adjudicated on the merits in state court unless the adjudication "resulted in a decision that was [1] contrary to, or [2] involved an unreasonable application of, clearly established

13

Federal law," as pronounced by the Supreme Court. Although the panel purports to find both conditions satisfied here, see Young v. Conway, 698 F.3d at 84–85, the first conclusion is defeated by New York precedent; the second by Harrington v. Richter, 131 S. Ct. 770.

1.     The New York Court of Appeals Does Not Misunderstand the *Wade* Rule

In order to find New York's rejection of Young's in-court identification challenge "contrary to" established Supreme Court precedent, the panel concludes that the New York Court of Appeals misunderstands the Wade rule, operating under the "mistaken impression that the independent source inquiry [is] an 'issue of fact,'" rather than a mixed question of law and fact. Young v. Conway, 698 F.3d at 84–85. It is no small matter for a panel of this court to charge New York's highest court with failing to understand so well-established and frequently applied a Supreme Court precedent as Wade. In fact, the conclusion is wholly unwarranted in light of precedent of the New York Court of Appeals—ignored by the panel—expressly recognizing that "a Wade hearing dealing with the propriety of a lineup identification involves mixed questions of law and fact." People v. Jackson, 98 N.Y.2d at 559, 750 N.Y.S.2d at 564.

The New York Court of Appeals effectively acknowledged that Young's Wade challenge raised a question of law as well as fact when it summarized his argument on appeal to contend that it was "impossible" as a matter of law "to find by the requisite clear and convincing evidence that the lineup would not influence [Mrs. Sykes's] in-court identification." People v. Young, 7 N.Y.3d at 44, 817 N.Y.S.2d at 578; see generally People

14

v. Leonti, 18 N.Y.2d 384, 389, 275 N.Y.S.2d 825, 829 (1966) (holding that, despite limits on its review of pure questions of fact, see N.Y. Const. art. 6, § 3(a), when presented with mixed question of law and fact, Court of Appeals could decide "whether the evidence adduced meets the [legal] standard required"). Although our court's panel concludes otherwise based on the New York Court of Appeals' observation that Young's Wade claim was effectively resolved by the lower courts' resolution of "an issue of fact," People v. Young, 7 N.Y.3d at 44, 817 N.Y.S.2d at 578, quoted in Young v. Conway, 698 F.3d at 85, that language of New York's highest court echoes rather than departs from controlling Supreme Court precedent. In United States v. Crews, the Supreme Court explained its reversal of the District of Columbia Court of Appeals' en banc preclusion of a Fourth Amendment-tainted identification by reference to trial court factfinding that was supported by the record: "[T]he trial court expressly found that the witness' courtroom identification rested on an independent recollection of her initial encounter with the assailant, uninfluenced by the pretrial identifications, and this determination finds ample support in the record." 445 U.S. at 473. In short, the Supreme Court itself recognizes that once a factual finding of an independent source is made, a reviewing court need only determine that the finding has support in the record to satisfy the Wade inquiry.

Our own precedent follows this approach. In Karavos Compania Naviera S.A. v. Atlantica Export Corp., 588 F.2d 1 (2d Cir. 1978) (Friendly, J.), at the same time that we cautioned against conflating questions of law and fact, we added a "qualification": a lower court's resolution of a mixed question "will ordinarily stand unless the lower court manifests

15

an incorrect conception of the applicable law." Id. at 8 (internal quotation marks omitted). In other words, where there is no question as to the applicable legal standard, the resolution of a mixed question of law and fact is often determined by the latter, as long as there is record support for the finding. That is all I understand the New York Court of Appeals to have been saying in Young's case.[8]

Accordingly, this court should withdraw the unwarranted charge that the New York Court of Appeals does not understand Wade and the conclusion the panel derives therefrom, i.e., that New York's affirmance of Young's conviction was "contrary to" federal law as clearly established by the Supreme Court. 28 U.S.C. § 2254(d)(1).

2.      The Panel's Failure To Adhere to *Harrington v. Richter*

Insofar as the panel also charges the New York Court of Appeals with "an unreasonable application of the correct standard" enunciated in Wade, Young v. Conway, 698 F.3d at 85, that conclusion defies Harrington v. Richter, 131 S. Ct. 770. In there construing the "unreasonable application" requirement of 28 U.S.C. § 2254(d)(1), the Supreme Court reiterated that not every erroneous application of clearly established federal law is an unreasonable application of that law. See id. at 786; Williams v. Taylor, 529 U.S.

---

[8] The New York Court of Appeals' decision precludes any suggestion that it failed to understand that the Wade standard requires "clear and convincing evidence that the lineup would not influence [Mrs. Sykes's] in-court identification." People v. Young, 7 N.Y.3d at 44, 817 N.Y.S.2d at 578. The panel may disagree with the Court of Appeals' conclusion that the evidence was sufficient to satisfy this standard, but that goes to the reasonableness of the court's application of the Wade rule, see infra Part B.2; it does not demonstrate that the ruling was "contrary to" Wade, 28 U.S.C. § 2254(d)(1).

16

362, 365 (2000) ("[T]he most important point" in applying AEDPA deference "is that an unreasonable application of federal law is different from an incorrect application of federal law." (emphasis in original)). A state court's application of federal law cannot be deemed unreasonable under § 2254(d)(1) "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Here, one Court of Appeals and two Appellate Division judges thought that the record did not satisfy the independent-source requirement. But six Court of Appeals judges, three Appellate Division judges, and the trial judge—the only one who actually saw the identifying witness—concluded that it did. A review of the various state court opinions precludes a conclusion that any of these jurists was other than "fairminded" in reaching the conflicting determinations. In such circumstances, the fact that the panel shares the minority view is not enough to denominate the majority view "unreasonable." See id. ("It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."). Indeed, the three judges who join in this dissent think it entirely reasonable for the state courts to have resolved the Wade question in favor of allowing Mrs. Sykes to make an in-court identification. See infra at **[19–22]**.[9]

---

[9] In urging otherwise, Judge Parker suggests that even the district attorney effectively conceded on appeal that Mrs. Sykes's identification was not supported by an independent source. See ante at **[7]**. Respectfully, this overstates the record. In the district court, respondent argued that the state courts' independent-source finding was not a clearly unreasonable application of federal law, but failed to argue that the point was barred from habeas review by Stone. On appeal, he argued only the Stone point, without repeating the

17

Judge Parker plainly disagrees with Harrington's strict standard of unreasonableness, concerned that few, if any, habeas cases will satisfy it. See ante at **[10]**. His concern, however, does not render that standard any less controlling on this court. As Harrington bluntly states, "[i]f this standard is difficult to meet, that is because it was meant to be." 131 S. Ct. at 786. "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Id. (internal quotation marks omitted). Thus, a state prisoner cannot secure § 2254 relief unless "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786–87.

New York's refusal to preclude Mrs. Sykes's in-court identification of Young cannot be deemed "beyond any possibility for fairminded disagreement." Id. That conclusion is reinforced by the fact that Wade's rule—that an in-court identification following a tainted (as opposed to suggestive) lineup must have an independent basis—is general rather than specific. "[T]he more general the rule" at issue in a § 2254 petition, "the more leeway [state] courts have in reaching outcomes in case-by-case determinations." Yarborough v. Alvarado, 541 U.S. at 664. To be sure, Wade identifies factors that properly inform the

merits argument. However flawed these strategic choices, I do not think they can fairly be construed to concede error in the state courts' independent-source ruling—let alone the "unreasonable" error necessary to support habeas. Harrington v. Richter, 131 S.Ct. at 786.

18

independent-source analysis, see 388 U.S. at 241, but it does not tell courts how to weigh those factors or the record evidence that informs them. Thus, it cannot be deemed an unreasonable application of "a specific legal rule . . . squarely established by th[e Supreme] Court," Knowles v. Mirzayance, 556 U.S. 111, 122 (2009), that the state courts assigned more weight than the panel would have to Mrs. Sykes's conscious attention to the robber, her identification of him from among six men in a non-suggestive lineup, and her professed strong recollection of his eyes,[10] while assigning less weight than the panel would have to the fact that the robber was masked,[11] that Mrs. Sykes underestimated both his age and height, and that she did not assist in producing a composite sketch, see generally Marshall v. Rodgers, 133 S. Ct. at 1450 (holding that state court ruling is neither contrary to nor an unreasonable application of general standards established by Supreme Court because state

---

[10] Raheem v. Kelly, 257 F.3d 122 (2d Cir. 2001), cited by the panel to discount Mrs. Sykes's independent recollection of the robber, see Young v. Conway, 698 F.3d at 80, is distinguishable in that it involved a highly suggestive lineup, triggering due process concerns with reliability that went beyond the deterrence goal in applying the exclusionary rule to Fourth Amendment violations, see Raheem v. Kelly, 257 F.3d at 137. It is precisely because the deterrence achieved by collateral review of Fourth Amendment challenges is minimal that such claims are generally barred from habeas review. See Stone v. Powell, 428 U.S. at 493–95. That the panel fails to accord proper AEDPA deference to New York's independent-source determination, in circumstances where it should not have conducted habeas review at all, only heightens the need for en banc review.

[11] Even when reliability rather than deterrence is the concern, a witness's inability to see a person's face does not necessarily preclude an in-court identification. See, e.g., Willis v. Garrison, 624 F.2d 491, 494 (4th Cir. 1980) (concluding that victim who was unable to see robber's face nevertheless could make identification based on height, weight, clothing, and complexion); Hamele v. Manson, 577 F. Supp. 439, 442–43 (D. Conn. 1983), aff'd 738 F.2d 418 (2d Cir. 1984) (table decision); People v. Spinks, 37 A.D.2d 424, 425–27, 326 N.Y.S.2d 261, 263–64 (3d Dep't 1971).

19

court's approach to standards differed from that of federal court on direct appeal).[12] As Harrington explains, "[u]nder § 2254(d), a habeas court must determine what arguments or theories supported or, . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." 131 S. Ct. at 786.

Although the panel doubts that Mrs. Sykes—a woman it has never seen or heard testify—could have formed a sufficient independent basis for identifying Young during the robbery, there is considerable record evidence that "could have supported" the state courts' contrary conclusion. Id. To begin, Mrs. Sykes's unhesitating identification of Young from among six men in a non-suggestive lineup necessarily derived from a source independent of the lineup. See United States v. Crews, 445 U.S. at 473 n.18 (recognizing that identification made during non-suggestive, Fourth Amendment-tainted lineup can support independent-basis finding). That the independent source was the robbery itself was, moreover, reinforced by evidence corroborating Young's identity as the Sykes robber. In addition to trial evidence linking Young to items stolen from the Sykes's home, this corroborating evidence included Young's extensive record for robbery and burglary, which

---

[12] Judge Parker contends that because "every single Wade factor turned against a finding of an independent source" in this case, it "makes no difference" how New York courts weighed the factors. Ante at **[10]**. The conclusion that every Wade factor turned against an independent-source finding depends on a federal habeas court assigning different weight to relevant evidence than New York courts did in reaching a contrary Wade determination. It is that action by the district court, repeated by the panel, that cannot be reconciled with Harrington and Yarborough.

was known to the state courts at the time of the <u>Wade</u> ruling. <u>See</u> <u>Brisco v. Ercole</u>, 565 F.3d 80, 94–95 (2d Cir. 2009) (recognizing state courts' authority to consider corroborating evidence in deciding whether to exclude identification evidence); <u>id.</u> at 96 (Korman, J., concurring) ("Corroborative evidence of guilt goes to the heart of the Supreme Court cases that initially addressed the problem posed by eyewitness identifications."). Indeed, when ruling on Young's <u>Wade</u> challenge, the state courts knew that, within days of the Sykes robbery, Young had burglarized two other homes under similar circumstances, including masking his face during at least one of the robberies. <u>See</u> <u>People v. Young</u>, 94 N.Y.2d 171, 175, 701 N.Y.S.2d 309, 311 (1999) (noting that, at initial sentencing for these other crimes, trial judge characterized Young as "confrontational burglar," whose willingness to engage in violence made him "any homeowner's worst nightmare" and "clear threat to the community" (alteration and internal quotation marks omitted)).

On this record, the state courts' <u>Wade</u> determination—at all three levels of review—that Mrs. Sykes's in-court identification of Young would rest on her independent recollection of the crime and not the tainted lineup can hardly be said to reflect an error so "well understood and comprehended in existing law" as to be "beyond any possibility for fairminded disagreement." <u>Harrington v. Richter</u>, 131 S. Ct. at 787. Much less does it manifest the sort of "extreme malfunction[] in the state criminal justice system[]" that warrants habeas relief. <u>Id.</u> at 786. Thus, the court should correct the panel's <u>Harrington</u> error <u>en banc</u>.

21

C.      Reliance on Social Science Literature Outside the State Court Record Violates *Cullen v. Pinholster*

In holding that New York courts unreasonably applied Wade, the panel cites extensively to social science literature discussing risks inherent in eyewitness identifications. See Young v. Conway, 698 F.3d at 77–84. The vast majority of this literature, largely referenced in a brief filed by amicus curiae, The Innocence Project, was not part of the state court record.[13] Indeed, much of the literature had not even been published when the New York Court of Appeals rendered its decision in this case. See id. (citing six studies published after May 9, 2006). The same holds true for cited state court analyses of literature on eyewitness identifications. See id. at 79 & n.9, 82 (citing State v. Guilbert, 306 Conn. 218 (2012), State v. Henderson, 208 N.J. 208 (2011), and People v. Santiago, 17 N.Y.3d 661, 934 N.Y.S.2d 746 (2011)). The review of such extrinsic evidence by a federal habeas court is foreclosed by Cullen v. Pinholster, which holds "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. at 1398 (emphasis added); see id. at 1399 ("Our cases emphasize that review under § 2254(d)(1) focuses on what a state court knew and did.").

---

[13] Three studies cited by the panel are referenced in footnotes to an article that was submitted to the state trial court as part of the defense's proffer of expert identification testimony that it sought to introduce at trial. See App'x of State Court Records 132 n.6, 134 n.16 & 136 n.36. Neither the studies themselves nor any of the other social science materials cited by the panel were ever made part of the state court record or even cited to state courts in support of Young's Wade challenge.

22

In an effort to evade Pinholster, the panel suggests that its "conclusion that Mrs. Sykes's in-court identification lacked an independent source is reinforced, but not compelled or controlled by, the literature we discuss." Young v. Conway, 698 F.3d at 79 n.8. The distinction is unconvincing; the panel opinion is largely devoted to a discussion of social science. See id. at 77–84. In any event, Pinholster's holding is not confined to the determinative bases for a habeas award; it applies generally to habeas "review." 131 S. Ct. at 1398–99. Thus, however much the panel may disclaim its social science discussion as dictum, see Young v. Conway, 698 F.3d at 79 n.8, the fact remains that it "review[ed]" materials not before the state courts and cited those materials to support its habeas decision, Cullen v. Pinholster, 131 S. Ct. at 1398–99. This is impermissible after Pinholster. See id; see also Ryan v. Gonzales, 133 S. Ct. 696, 704, 708 & n.14 (2013) (citing Pinholster in unanimously rejecting argument that prisoner's mental incompetency prevented counsel from pursuing habeas challenge (based, in part, on tainted identification) because § 2254(d) proceedings are wholly "backward-looking" and "record-based").[14]

The panel's Pinholster error is compounded, moreover, by the fact that the cited extrinsic materials do not speak to the independent-source question at issue. Their focus is the general reliability of eyewitness identifications. Reliability is a question that the law

---

[14] Judge Parker suggests that such a construction of Pinholster would preclude judges from even reading briefs that might reference any extrinsic materials. See ante at **[5]**. Not so. A habeas court presented with extrinsic materials in a brief or appendix need only make clear that the materials will play no part in its deliberations to satisfy Pinholster. That is hardly what occurred in this case.

23

generally leaves for jury resolution, see Perry v. New Hampshire, 132 S. Ct. 716, 727–28 (2012), except when the government subjects a witness to suggestive procedures, in which case due process conditions the witness's in-court identification on a showing of independent reliability, see Neil v. Biggers, 409 U.S. 188, 198–99 (1972); Stovall v. Denno, 388 U.S. 293, 302 (1967). That is not this case. Young specifically disavowed any suggestivity argument, complaining only of Fourth Amendment taint. See supra at **[3 n.2]**. This triggered Wade's independent-source inquiry, not due process's independent-reliability inquiry. While the distinction between the two is not always easily discerned, see 6 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 11.4(g) (5th ed. 2012), that distinction informs the Supreme Court's recognition that an identification made from a non-suggestive lineup can support an independent-basis finding, see United States v. Crews, 445 U.S. at 473 n.18, whereas a suggestive lineup is the essence of the problem requiring a showing of independent reliability.[15] Thus, the panel injects considerable confusion into our Wade jurisprudence by relying on social science literature addressing the general reliability of eyewitness identifications to make an independent-source assessment.[16]

---

[15] As noted supra at **[21]**, Mrs. Sykes's unhesitating ability to identify Young from among six men in a non-suggestive lineup is powerful evidence that she possessed a basis for identifying him at trial independent of the lineup.

[16] Judge Parker suggests that, by pointing out that the extrinsic materials cited by the panel do not speak to the independent-source question at issue, I effectively acknowledge that the panel "could not have relied" on them in deciding this case. Ante at **[6]**. I respectfully disagree. The panel's extensive citation to these materials demonstrates its reliance. See Young v. Conway, 698 F.3d at 77–84. My point is that the panel's reliance was erroneous not only because the materials were extrinsic in violation of Pinholster, but

24

Further, even with respect to reliability, the cited social science literature speaks only in terms of probabilities, not absolutes.[17] At best, social science has determined that in some cases, certain identified variables might make some eyewitness identifications less reliable. Such probabilities hardly translate into legal maxims for appellate—much less collateral—review of in-court identification challenges.[18]

What such social science literature might inform are trial court decisions as to whether juries should hear expert testimony about the general reliability of eyewitness identifications

also because they were not relevant to the particular identification challenge at issue.

[17] See, e.g., Charles A. Morgan III, et al., Accuracy of Eyewitness Memory for Persons Encountered During Exposure to Highly Intense Stress, 27 Int'l J. L. & Psychiatry 265, 274 (2004) (observing that, while high stress had negative impact in about half of cases studied, stress had no impact on memory of many individuals, and for minority of subjects, eyewitness memory was better for high- as compared with low-stress conditions); Nancy Mehrkens Steblay, A Meta-Analytic Review of the Weapon Focus Effect, 16 Law & Human Behav. 413, 417 (1992) (stating that presence of weapon during crime has only a "relatively small effect," reducing correct identifications by approximately 10%); Robert K. Bothwell et al., Cross-Racial Identification, 15 Personality & Soc. Psychol. Bull. 19, 23 (1989) (concluding that own-race bias accounts for "11% of the variance in recognition ability of Black subjects and 10% of the variance in recognition ability of White subjects").

[18] A Special Master Report prepared for the Supreme Court of New Jersey reviewed much of the same social science literature as the panel, found it reliable, but nevertheless cautioned that the impact variables such as a perpetrator's disguise, use of a weapon, victim stress, race differentials, multiple pre-trial identifications, time lapses between crime and identification, etc., have on the reliability of eyewitness identification is necessarily "only probabilistic." Special Master Report 73–74, State v. Henderson, 208 N.J. 208 (No. A-8-08) ("[N]either science nor scientists can say, at least at present, whether a real-life identification is accurate or not . . . . The science has simply identified variables that have an unquantifiable capacity or tendency to impair or contaminate memory and thus bring into question the reliability of a real-life eyewitness identification.").

or be given special instructions on the subject.[19] Courts have reached different answers on these questions. Compare State v. Henderson, 208 N.J. at 298 (concluding that special jury instruction was preferable to expert testimony in assisting jury to assess identification evidence), with State v. Guilbert, 306 Conn. at 263 (holding that defendant should be permitted to offer expert testimony if state relies on eyewitness identification, deeming comprehensive jury instructions inadequate substitute); see also Daniel Patrick Moynihan, Social Science & the Courts, 54 Pub. Int. 12, 19–20 (Winter 1979) (observing that "social science is rarely dispassionate, and social scientists are frequently caught up in the politics which their work necessarily involves").

In the ongoing debate about the proper trial use of social science studies on the reliability of eyewitness identifications, our own court has thus far come out in favor of district courts' broad discretion to exclude such evidence, see United States v. Lumpkin, 192 F.3d 280, 289 (2d Cir. 1999), and to deny eyewitness-specific jury instructions, see United

[19] Insofar as Judge Parker suggests that the panel's citation to extrinsic materials was intended only to alert "the bench and bar to the existence of the studies and to go no further," ante at [4] (emphasis added); see also id. at [2] (stating that citations to extrinsic materials rendered "important service to the bench and bar"), that narrow purpose is hardly evident in an opinion that integrates extrinsic materials throughout a Wade assessment that Pinholster required be based only on the record before the state court. See e.g., Young v. Conway, 698 F.3d at 80–82 (following one paragraph discussion of facts regarding independent identification with six-paragraph discussion of extrinsic studies indicating that presence of such facts contributes to mistaken identifications). Further, trial courts are usually ahead of us in their awareness of developments pertaining to evidentiary matters; most of the studies cited by the panel are already referenced in published opinions, see, e.g., State v. Henderson, 208 N.J. at 230–279; and the Innocence Project is dedicated to raising judicial awareness of their existence.

States v. Luis, 835 F.2d 37, 41 (2d Cir. 1987). But see United States v. Brownlee, 454 F.3d 131, 144 (3d Cir. 2006) (identifying error in exclusion of expert testimony when primary issue before jury was reliability of four eyewitnesses); United States v. Hall, 165 F.3d 1095, 1119–20 (7th Cir. 1999) (Easterbrook, J., concurring) (supporting eyewitness-specific jury charge). It seems curious, to say the least, that, at the same time we do not compel the presentation of such expert opinions to federal juries that actually see and hear in-court identifications, we would ourselves rely extensively on such opinions to conclude that an in-court identification by an eyewitness whom we have never seen or heard necessarily lacked an independent basis. That we make this determination on collateral review of state courts to which we owe AEDPA deference is more curious still. That we make it with respect to a Fourth Amendment claim barred from federal habeas review by Stone v. Powell is most curious of all.

III.    Conclusion

In sum, this case warrants en banc review to correct panel errors with respect to three Supreme Court precedents:

1. By reviewing a Fourth Amendment claim in circumstances where the petitioner has neither pleaded nor proved the denial of a full and fair opportunity to litigate that claim in state courts—and where the record in fact shows that he had that opportunity—the panel fails to adhere to Stone v. Powell, 428 U.S. 465, and creates a "circuit split."

2. To justify conducting its own Wade analysis and granting habeas relief, the panel both (a) mistakenly charges the New York Court of Appeals with failing to understand Wade

27

and (b) fails to accord the state courts' <u>Wade</u> analysis of the independent basis for Mrs. Sykes's in-court identification the AEDPA deference required by <u>Harrington v. Richter</u>, 131 S. Ct. 770.

3. The panel supports its habeas grant by reference to social science studies not in the state court record, contrary to <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388.

Accordingly, I respectfully dissent from the denial of rehearing <u>en banc</u>.

28

JOSÉ A. CABRANES, *Circuit Judge*, with whom Judge RAGGI and Judge LIVINGSTON join, dissenting in the denial of rehearing *en banc*:

I concur fully in Judge Raggi's comprehensive and forceful dissent from the denial of *en banc* review. I write separately only to summarize and underscore why the panel decision is wrong and necessitates review.

First, the panel decision is inconsistent with not one but *several* precedents of the Supreme Court. It erroneously states that the New York Court of Appeals misunderstood and misapplied the independent-source rule of *United States v. Wade*, 388 U.S. 218, 240-41 (1967). It also fails to accord New York state courts appropriate AEPDA deference.[1] *See, e.g.*, *Harrington v. Richter*, 131 S. Ct. 770 (2011). Even though ten state court judges (six New York Court of Appeals judges, three Appellate Division judges, and the trial judge) concluded that the record satisfied *Wade*'s independent-source requirement, the panel inexplicably holds that such a conclusion is an unreasonable application of federal law, *see* 28 U.S.C. § 2254(d)(1), and not one upon which "fairminded jurists could disagree," *Harrington*, 131 S. Ct. at 786 (internal quotation marks omitted). *See Young v. Conway*, 698 F.3d 69, 84-85 (2d Cir. 2012).

Second, the panel decision ignores the bar to habeas relief enunciated in *Stone v. Powell*, 428 U.S. 465 (1976), by granting habeas relief to a petitioner who *never* argued, let alone demonstrated, that he was denied a full and fair opportunity to litigate his Fourth Amendment claim. And in doing so, it creates a "circuit split" with the Court of Appeals for the Ninth Circuit, which held in *Woolery v. Arave*, 8 F.3d 1325 (9th Cir. 1993), that "*Stone v. Powell* precludes the federal court from enforcing the exclusionary rule through the writ of habeas corpus even though the state has failed to raise the *Stone* issue." *Id.* at 1326. The panel decision does further harm to our habeas jurisprudence by

---

[1] "AEDPA deference" is, of course, shorthand for the requirements of the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254.

suggesting that the application of the *Stone* bar depends on the *type* of evidence that is the basis for the Fourth Amendment challenge. *See Young*, 698 F.3d at 87 (noting that identification evidence "lacks the typical indicia of reliability that ordinarily weigh against re-litigating a Fourth Amendment claim on collateral review"). But *Stone* does no such thing; it is a *categorical* bar. *Id.* at 494-95 & n.37; *see also Graham v. Costello*, 299 F.3d 129, 134 (2d Cir. 2002) (noting that the "[*Stone*] bar to federal habeas review of Fourth Amendment claims is permanent and incurable absent a showing that the state failed to provide a full and fair opportunity to litigate the claim"). In short, the panel decision cannot be squared with *Stone* or the decisions of this Court that have applied *Stone*.

Third, the panel decision improperly condones referencing, in a habeas proceeding, materials that were never part of the state court record. Any such practice is obviously unsound, but it also has the additional distinction of being in direct contravention of the instruction of the Supreme Court in *Cullen v. Pinholster*, 131 S. Ct. 1338 (2011), that "review under § 2254(d)(1) is limited to the record *that was before the state court that adjudicated the claim on the merits*." *Id.* at 1398 (emphasis supplied). Moreover, the panel's reference to social science studies actually misses the mark. As Judge Raggi explains, Young's habeas challenge was limited to the question of whether Mrs. Sykes's identification had *an independent source*—not whether her identification was *reliable*. In turn, the social science literature cited at length by the panel only addresses whether eyewitness testimony is *generally reliable*; these studies in no way suggest that Mrs. Sykes's identification lacked *an independent source*.

In sum, any one of these errors is grave enough to require *en banc* review. The fact that the panel decision makes all of them compounds the harm done. The result will be great confusion in the habeas jurisprudence of this Circuit and in that of other courts that may be misled in following the panel's lead. And absent review by a higher authority, we will have to live with the baleful consequences of this unfortunate decision for many years to come.